IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

JIMMY MOSS and
MOSS FARMS, INC.                                                    PLAINTIFFS


v.                             5:06-CV-010-JLH


AMERICAN ALTERNATIVE
INSURANCE CORPORATION                                              DEFENDANT


DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE
TO MOTION FOR SUMMARY PARTIAL JUDGMENT

The plaintiffs urge the Court not to "parcel out" one individual act of "questionable conduct", but rather to view all the acts "as a whole." The reason that plaintiffs take this position is quite clear. None of the individual acts alleged by plaintiffs support a finding of bad faith. The plaintiffs urge the Court to gloss over what they call "individual acts" so that the deficiencies in each will be hidden. To establish their claim of bad faith, the plaintiffs would have the Court to draw inference upon inference from unrelated and quite distant "facts". While the Court is to draw all **_reasonable_** inferences in favor of plaintiffs the Court is not required to speculate or draw multiple inferences. Hitt v. Harsco Corp., 356 F.3d  920 (8th Cir. 2004). AAIC is not asking the Court to invade the providence of the jury (as the plaintiffs so clearly warn the Court not to do). Defendant only asks that the Court examine the **_undisputed facts_** and rule on its Motion for Partial Summary Judgment. The undisputed facts clearly show that summary judgment is proper.

At the outset it should be noted that the plaintiffs continually misstate the relationship between AAIC and ASI and its adjusters in their brief.  Plaintiffs repeatedly refer to ASI as AAIC's "general agent".  The plaintiffs omit one key word.  ASI is a ***Managing*** General Agent of AAIC pursuant to the terms of the MGA Agreement which has been submitted to the Court under seal.  ASI only has those duties, rights and obligations that are set forth in the Agreement.  See, MGA Agreement at Articles II and IV.  Pursuant to the Agreement, ASI is an independent contractor of AAIC and may only act within the bounds of its contracted authority.  Id. at Article XI, para. M.  In addition, Mickey Mahon and Van Gibbins are independent contractors of ASI.  See, Mahon Independent Adjusters Agreement, para. 2; Gibbins Depo. at pp. 17-18.  Plaintiffs would hold AAIC liable for the acts of its independent contractor and even in some instances, the acts of an independent contractor of an independent contractor of AAIC.  As the Court is well aware, a principal may not be held liable for the tortious acts of its independent contractors.  A.M.I. (Civil) 2006, 209, 707.  Plaintiffs' attempt to impute these acts to AAIC must fail.

The plaintiffs concede that they have not stated a claim of fraudulent misrepresentation against AAIC.  The plaintiffs admit that no harm was caused by any misstatement.  Yet they want to use this conduct as a basis for a bad faith claim.  The problem with plaintiffs' argument is that the alleged conduct must constitute bad faith and that bad faith conduct ***must*** cause damage in order to be actionable.  A.M.I. (Civil) 2006, 406.

Defendant admits that Forrest Armstrong initially represented the policy to require mandatory, binding appraisal.  See, Armstrong Depo. at pp.34-35. Assuming that Forrest Armstrong's representation was done with all of the evil intent and ill will that one could muster, the question arises "What would have been the result?".  The result would have been that both

parties, ***the plaintiffs and AAIC,*** would have been subject to a binding appraisal process.  Mr. Moss might have won or lost the appraisal just as AAIC might have or won or lost.  If Mr. Moss could have prevailed, "dishonest, oppressive or malicious" intent cannot be inferred from the misrepresentation.

In their brief, the plaintiffs argue that the appraisal process itself is biased.  In order to support their argument, the plaintiffs rely on omissions and misstatements of the facts and isolated, ancient occurrences.  First, the plaintiffs state that AAIC refused to agree to any umpire unless the proposed umpire "had worked for an insurance company."  What the plaintiffs conveniently forget to mention is that the parties had agreed to the appointment of a Farm Service Agency employee to act as umpire for the parties.  Van Gibbins[1] agreed to the appointment because of the gentleman's familiarity with damage to cotton.  Gibbins Depo. at pp. 72-73.  After initially agreeing to act as umpire, he withdrew at his superiors' request.  As Van Gibbins stated in his deposition,  he did not agree to Charles Guy and Gibbs Ferguson because they were not knowledgeable about hail damage to cotton.  Gibbins Depo. at pp. 71-74.  Van Gibbins also provided names which were not agreed to by Mr. Moss.  All of these facts are undisputed.  Mr. Moss is really arguing that AAIC committed bad faith because it did not agree to individuals that ***he*** nominated to serve as umpire.

The plaintiffs also argue that a previous arbitration with ASI where the award was set aside is evidence of bad faith.[2]  This arbitration occurred over 20 years ago in the State of Illinois. See D. Johnson Depo. at p. 116; Defendant's Answers to Plaintiff's Supplemental Interrogatory No. 4.

---

[1]Mr. Gibbins is an independent contract adjuster who was retained by ASI to act as an appraiser in this case.  This is the only time Mr. Gibbins worked for ASI.

[2]The admissibility of this evidence is highly questionable.

AAIC was not involved in this claim.  How this old, unrelated event involving a different insurance company evidences bad faith is anyone's guess.  One thing, however, is certain:  It is _**not**_ evidence of bad faith in the case at bar.

Arkansas law is very clear that the failure to investigate a claim does not constitute bad faith.  Reynolds v. Shelter Mutual Insurance Company, 313 Ark. 145, 852 S.W. 2d 799 (1993).  The plaintiffs do not dispute this statement of the law.  Instead, the plaintiffs attempt to establish bad faith in the adjusting process through incidents which are unrelated to the case at bar.  First, plaintiffs quote at length from the depositions of Glover Linnet and Jeff Byrd, two former adjusters of ASI, regarding comments David Johnson made to them in an unrelated hail claim which occurred in Mississippi County, Arkansas.  This claim arose from a storm which occurred in May of 2003, and the statements were made shortly thereafter.  Linnert Depo. at pp. 13-14.  AAIC was not involved in the Mississippi County case.  Id. The relevance and the admissibility of these comments aside, these alleged statements (even if true) do not establish any act which would constitute bad faith in the case at bar.  ASI never contacted the FBI regarding this case and Mr. Moss was never threatened by or with the FBI by ASI.   D. Johnson Depo. at p. 75.  In addition, the alleged statements were made over _**two years prior**_ to the storm that caused damage in the case at bar.  Next, the plaintiffs allege bias by Mickey Mahon when adjusting the claim.  What is interesting to note is that they do not dispute the fact that the claim was adjusted.  The law clearly provides that the failure to investigate the claim is not the sort of affirmative conduct that gives rise to a cause of action for the tort of bad faith.  Reynolds, 313 Ark. at 149; Richison v. Boatmens Arkansas, Inc., 64 Ark. App. 271, 941 S.W. 2d 112 (1998) (The failure to conduct more than a cursory investigation does not

constitute bad faith). Even assuming all the inferences argued by plaintiffs are true, the fact still remains that Mickey Mahon adjusted the claim and that this does not constitute bad faith.

The plaintiffs next pursue a personal attack against David Johnson. The plaintiffs allege that David Johnson is the President and CEO and part owner of ASI, Inc. This fact is admitted. Plaintiffs also argue that David Johnson signed a guaranty agreement with AAIC. Defendant also admits this fact. Drawing all inferences in favor of the plaintiffs from these two facts does not establish any affirmative act of misconduct. At most, the facts may show that David Johnson has a financial interest in ASI, but they do not establish that he ***did anything*** which would constitute bad faith.

The final isolated "incident" which the plaintiffs argue is an attack on Van Gibbins. Van Gibbins is an adjuster who is retained by ASI as its independent appraiser. As was stated earlier, Mickey Mahon, a contract adjuster for ASI, initially inspected Mr. Moss' claim and stated that he found no damage due to hail. The parties began the appraisal process with each side appointing an appraiser. The plaintiffs appointed Mike Foresman and ASI appointed Van Gibbins. Van Gibbins had never worked for ASI prior to this claim. Gibbins Depo. at pp. 17-18. Mr. Gibbins' sole responsibility in this case was to act as an appraiser. While the facts alleged by the plaintiffs are sharply in dispute, none of these acts can be attributed to ASI and most certainly none to AAIC. Van Gibbins was an independent contractor of ASI and had no relationship whatsoever to AAIC. But to take the matter one step further, none of the "bad acts" which the plaintiffs allege Van Gibbins committed constitute bad faith. Mr. Gibbins inspected every field, took notes and determined that there was no damaged to Mr. Moss' crops due to hail. Gibbins Depo. at pp. 39-44; Moss Depo. at pp. 61-63. *See*, Richison, 64 Ark. App. 271.

In its final accusation against AAIC, the plaintiffs are critical of AAIC for filing a declaratory judgment action. Throughout this litigation, the plaintiffs have alleged that AAIC committed bad faith by filing the declaratory judgment action before "they even were advised that their claims would be denied." See, Plaintiff's Answer to Interrogatory No. 13. Now that their argument has been shown to be factually incorrect, the plaintiffs change their tune. On November 28, 2005, the plaintiffs were advised through their attorney that their claim would be denied. *See*, Perkins letter to Gibson dated November 28, 2005. AAIC had offered to continue with voluntary, non-binding appraisal as had been requested by plaintiffs and plaintiffs refused. It was obvious to the parties that the claim was heading toward litigation and plaintiffs' refusal to enter into non-binding, voluntary appraisal made it a certainty. Since the claim was headed for litigation, AgriServe took the initiative and filed a declaratory judgment action seeking to have the rights of the parties determined in a court of law. The plaintiffs now argue that the filing of a declaratory judgment action is unusual[3] and that this is evidence of bad faith. The desire to have one's rights determined by a court of law is neither unusual or bad faith. First Marine Ins. Co. v. Booth, 317 Ark. 91, 847 S.W. 2d 255 (1994).

The most significant omission in plaintiffs' Response Brief is the failure to have any meaningful discussion of whether the alleged conduct justifies instructing the jury on punitive damages. Plaintiffs only dedicate one small paragraph to the topic. Plaintiffs seek damage for emotional distress[4] and punitive damages. Punitive damages may only be recovered after a showing

---

[3]To support this contention, the plaintiffs cite the testimony of Van Gibbins, a contract adjuster, who only worked on this one file for ASI as an appraiser.

[4]It should be noted that the corporation may not recover for "mental anguish". Further, emotional suffering is usually reserved for outrage claims which have not been alleged in this case.

by clear and convincing evidence that AAIC intentionally and maliciously pursued a course of conduct for the purpose of causing damage to plaintiffs.  A.M.I. (Civil) 2006, 2218.  The factual allegations, accepted as true and viewed in the light most favorable to them, do not sustain this burden.  In an attempt to clear this hurdle, the plaintiffs resort to incidents which are remote in time and factually distinct from the case at bar.  Conduct that does not sustain a claim of bad faith can not support an award of punitive damages which requires a much higher burden of proof.  As plaintiffs have failed to meet this burden, partial summary judgment should be granted.

WHEREFORE, defendant, American Alternative Insurance Company, prays that its Motion for Partial Summary Judgment be granted and for all other relief to which it is entitled.

Respectfully submitted,

THE PERKINS LAW FIRM, P.A.
G. S. Brant Perkins (89166)
P. O. Box 4054
Jonesboro, AR  72403-4054
Ph:  (870) 931-5800


By:

Attorney for Defendant American
Alternative Insurance

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that service of the above and foregoing Motion for Summary Partial Judgment was made by mailing a copy of same to Mr. C. C. Gibson, III, Gibson & Hashem, P. L.C., Attorney for Plaintiffs, P. O. Drawer 447, Monticello, Arkansas 71655-0447, by United States Mail with sufficient postage to insure delivery, and via ECF on this 23rd day of October, 2006.

G. S. Brant Perkins

MOTION FOR PARTIAL SUMMARY JUDGEMENT
SUPPLEMENTAL EXHIBIT LIST

1.      Excerpts from Deposition of Van Gibbins.

2.      Excerpts from Deposition of David Johnson.

3.      Defendant's Answer to Plaintiffs' Supplemental Interrogatories No. 4.1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

JIMMY MOSS AND MOSS FARMS, INC. )
       PLAINTIFF )
           )
V.          ) Case No.: 5:06-CV-010JLH
           )
AMERICAN ALTERNATIVE INSURANCE )
CORPORATION, et al.,    )
       DEFENDANTS)

---

VIDEO DEPOSITION OF VAN GIBBONS
TAKEN MAY 9, 2006
JONESBORO, ARKANSAS

---

APPEARANCES

On Behalf of the Plaintiff:

   MR. C. C. GIBSON, III
   GIBSON & HASHEM, P.L.C.
   119 South Main Street
   Monticello, Arkansas 71657

On Behalf of the Defendant:

   MR. BRANT PERKINS
   THE PERKINS LAW FIRM
   624 South Main, Suite 101
   Jonesboro, Arkansas 72401

Also Present:
   Mr. Tolly Murph, Videographer
   Mr. Jimmy Moss

**B & H Reporting**
*Laura D. Bowen, CCR*
870-932-1419
ldbowen@indco.net



EXHIBIT
# 1

1   A    When I got of the Navy.

2   Q    Okay.  Anything else?

3   A    No.

4   Q    Okay.  Have you ever taken bankruptcy or anything like

5  that?

6   A    No.

7   Q    Okay.  Uh, what is, uh, uh--you--are you presently

8  employed by the insurance company?

9   A    Yes, sir.

10   Q    What insurance company?

11   A    Uh, ARMtech, RCI--I mean, ARMtech, RCIF, Producers Ag,

12  Farm Bureau.  Those companies there that I give you.

13   Q    Okay.

14   A    I work for about five or six different companies.

15   Q    And do you work for AgriServe?

16   A    ASI?

17   Q    Yes, sir.

18   A    No.

19   Q    Have you ever?

20   A    No, sir.

21   Q    Okay.  Why not?

22   A    I just haven't signed a contract with them.

23   Q    Okay.  Uh, okay.  Uh, when you were working the Moss

24  claim, were you working for AgriServe?

25   A    Yes, sir.

1   Q    Okay.  So we do know you worked for them then?

2   A    Well, yeah, I was hired to do that claim.

3   Q    Okay.  Any other times that you've worked for them?

4   A    No.

5   Q    And--and how is it that you came to be hired for that?

6   Who hired you?

7   A    Mr. Carl.

8   Q    Carl Woodham?

9   A    Carl Woodham.

10  Q    And did he do just call you on the phone?

11  A    He just called and wanted to know if I would go down and

12  look at it, and I said yes.

13  Q    Okay.  Did you know there was a dispute about it?

14  A    What?

15  Q    Did you know there was a dispute about the claim?

16  A    Well, yes.

17  Q    What--

18  A    He said--he said that, uh--that Mickey and Mr. Moss didn't

19  agree and wanted me to go down and look at it.

20  Q    Okay.  And what did they not agree on?  What was your

21  understanding?

22  A    Percentage of loss that occurred by hail.

23  Q    Okay.  Do you know what the difference in agreement was?

24  A    Never asked them.

25  Q    Okay.  Why?

1    actually sued Mr. Moss on December the 5th of 2005.  Do you

2    know anything about that?  You don't?  Is that a no?

3    A    That's a no.

4    Q    Okay.  Did you--anything unusual about the insurance

5    company suing the farmer?  Have you ever heard of that?

6    A    I never have heard of it.

7    Q    Okay.  I want you to turn--you're at the right page.  To

8    page 20 of Exhibit 1, that's a, uh--that's a, uh, uh, uh Dr.

9    Charles B. Guy, Jr. has a Ph.D. in Agronomy from the University

10   of Arkansas 1986, and that's his resume I suspect, Curriculum

11   Vitae.  Uh, uh, do you know Dr. Guy?

12   A    Don't know a thing about him.

13   Q    Didn't--didn't Mr. Moss suggest him as a person to serve

14   as an umpire in a fair arbitration?

15   A    Yes, sir.

16   Q    And--and you--did you write did not approve on there?

17   A    Yes, sir.

18   Q    Why did you not approve?

19   A    Uh, I was looking for somebody that knew a little bit

20   about hail and hail damage to crops, plants.

21   Q    And, uh, uh--well, let me just ask you this way.  Uh, how

22   do you know this Dr. Guy didn't know anything about that?

23   A    Well, I talked with him.  He told me he didn't.

24   Q    Oh, he--

25   A    He told me he had never worked hail claims.

1   Q    Uh-huh.  Is it important that the umpire have the ability

2   to work a hail claim?

3   A    It helps.

4   Q    Not required though, is it?

5   A    Not required.

6   Q    Mr. Grayson didn't have any, uh, hail experience, did he?

7   A    Yes, sir.

8   Q    Oh, he did?

9   A    Yes, sir.

10  Q    As a crop insurance adjuster?

11  A    Yes, sir.

12  Q    So really what you wanted is an umpire with somebody that

13  had worked for insurance companies in these fields?  Is that

14  about the size of it as the umpire on the arbitration?

15  A    Not the companies.  He's the--the hail--to know a little

16  bit about the hail.

17  Q    And how to adjust it for an insurance company?

18  A    Mr. Grayson didn't work for an insurance company.

19  Q    Not at the time, but he had before, hadn't he?

20  A    No.  In '81, he was--he was with Federal Crop Insurance.

21  Q    So he had been a Federal Crop Insurance adjuster in the

22  past?

23  A    Yes.

24  Q    And, uh--and--and represented the viewpoint of the

25  insurance company; am I right?

1    A    Federal crop, yeah.

2    Q    Yeah, I understand.

3    A    Yeah.

4    Q    And there are insurance companies involved in that--

5    A    Yeah.

6    Q    --too?

7    A    Yeah.

8    Q    Okay.  And even though they called it Federal Crop, there

9    were insurance companies involved; am I right?

10   A    Yes.

11   Q    Okay.  So Mr. Grayson was a former crop insurance adjuster

12   just like yourself?

13   A    Yes, sir.

14   Q    Okay.  And he had been representing the interest of the

15   insurance companies in the past; is that right?

16   A    A year or two.

17   Q    And that's why he was acceptable to you as an umpire?

18   A    Well, I felt like he was an honest man, and he knew what

19   he was looking at.

20   Q    And he also had experience working for insurance

21   companies?

22   A    Right.  Correct.  Yes.

23   Q    And that's one of the things that's important to you?

24   A    Yes, sir.

25   Q    Because you didn't want somebody who had not worked in

1    that field--

2    A    That's right.

3    Q    --am I right?  As the umpire?

4    A    That's right.

5    Q    And, uh, is that the same reason that Judge Gibbs Ferguson

6    was not acceptable, uh, uh--

7    A    I didn't feel like he--

8    Q    --as an umpire?

9    A    I didn't feel like he had the experience either.

10   Q    You thought he would fair and honest, didn't you?

11   A    Well, he probably be fair and honest, but what I--I wasn't

12   satisfied with him.

13   Q    Unless he had worked for the insurance companies in the

14   past; right?

15   A    No, unless he had experience in hail damage.

16   Q    For insurance--

17   A    I didn't say--

18   Q    For insurance companies; right?

19   A    I didn't say that.

20   Q    Okay.

21   A    I don't--I don't where he worked for them.

22   Q    I--I--I understand that.  He--he did not have the

23   qualification of having worked for insurance companies in the

24   past adjusting claims.

25   A    I don't know where he worked.

1    A    I don't know.

2    Q    Did he have somebody with him?

3    A    Yes.

4    Q    Okay.  Was he a crop consultant that had expertise in crop

5    damages and things of that nature?

6    A    I don't know what his background was.

7    Q    Okay.  But there was somebody with Mr. Moss?

8    A    Yes, sir.

9    Q    Where did you meet Mr. Moss?

10   A    Winchester Gin.

11   Q    All right.  And tell me about the conversation there at

12   the gin if you remember any of it.

13   A    Well, we met there and went to the farm.

14   Q    Okay.  Well, do you remember any conversation between you

15   and Mr. Moss or Mr. Foresman at that time?

16   A    Well, we just (witness inaudible) of his and went with Mr.

17   Foreman (sic/Foresman) and, from there, we went to the farm.

18   Q    That was it?  That's all you remember about that

19   conversation?

20   A    Yeah.

21   Q    Okay.  So y'all went to the farm?  Did you go in your

22   truck?

23   A    I met him at the stop.  I followed him out to his shop.

24   Q    Okay.  And you followed who, Mr. Moss?

25   A    Yes, sir.

1    Q    And was--was Mr. Foresman with him?

2    A    Yes, sir.

3    Q    In--in Mr. Moss' truck?

4    A    Yes, sir.

5    Q    Okay.  And you followed them in your truck?

6    A    Yes.

7    Q    Went to Mr. Moss' farm shop?

8    A    Where is it?

9    Q    Went--y'all went to Mr. Moss'--

10   A    Went to his farm, yeah.

11   Q    Mr. Moss' Farm; right?

12   A    Right.

13   Q    Okay.  And you got out of your truck.  Tell me what

14   happened next.

15   A    Mr. Moss said he would show us where the strips was on the

16   farm, and, uh--and we got in his truck, and I rode with him and

17   Mr. Foreman (sic/Foresman).

18   Q    Uh-huh.  Do you remember any other conversations?

19   A    Well, I just--it looked like it might rain and first one

20   thing and another.  I don't remember everything.

21   Q    So--so the people that went with you during your

22   inspection of the Moss Farm, uh, uh, hail damage claim on their

23   cotton crop was Mr. Moss and Mr. Foresman?

24   A    Yes.

25   Q    Anybody else?

1   A   Nobody else.

2   Q   Were they with you the entire time that you were doing

3   this inspection?

4   A   Yes, sir, because I was riding with them.

5   Q   Okay.  Mr. Moss and Mr. Foresman?

6   A   Yes.

7   Q   Okay.  And, uh, okay.  And, uh, were you carrying any

8   equipment of any kind or anything like that with you?

9   A   Yeah, I had a camera with me.

10   Q   All right.

11   A   And, uh, a counter that, uh--to count the lock or the boll

12   or whatever.

13   Q   Is that a little hand clicker?

14   A   Yeah, it's a little old hand clicker.

15   Q   Okay.  All right.  Any other equipment?

16   A   Not at that time.

17   Q   Okay.  How many places did y'all stop?

18                THE WITNESS:  How many strips did

19            you leave, Mr. Moss?

20   BY MR. GIBSON:

21   Q   Well, you can't ask him.  If--

22   A   Well.

23   Q   --you remember, you remember.  If you don't remember, then

24   you can say--

25   A   One or two, uh, strips in each field.

1    Q    So there was, what, around 30 fields?

2    A    There was quite a few of them.

3    Q    Sound about right?

4    A    Yeah.

5    Q    And so you went through those strips in each field?

6    A    Yes, sir.

7    Q    Did you skip any of them?

8    A    If he took me to the right fields, I didn't.

9    Q    Okay.  But did you ever ride by one that was his and just

10   decide, well, we'll skip that and go to the next one?

11   A    Maybe one or two--

12   Q    Okay.

13   A    --where they would be just like the others.

14   Q    Okay.  And was his--during the time that you were doing

15   this inspection, October 18th, 2005 on the Moss Farm, uh, uh,

16   was Mr. Moss' pickers picking cotton?

17   A    Yes, sir.

18   Q    Okay.  You remember that?

19   A    Yes, sir.

20   Q    Okay.  And, uh, uh, if you would, tell me, uh, uh--tell me

21   the conversation that occurred during this inspection with Mr.

22   Moss and Mr. Foresman to the best of your ability.

23   A    Well, we would go to those strips, and we would look at

24   the cotton, and I'd make me some counts that the locks gone out

25   of the burrs, and, uh--and that was pretty well it at each

1    place.  When we would get through it, I'd say, well, I'm--I see

2    what I need to see.  Let's go, and we'd go to the next one.

3    Q    Okay.  Until you got through?

4    A    Yes, sir.

5    Q    Do you remember any conversation or any statements by

6    Jimmy Moss during that while y'all were inspecting the cotton?

7    A    Mr. Moss had nothing to do with--with what me and Mr.

8    Foreman (sic/Foresman) were looking at.

9    Q    Okay.  But--but you don't remember--my question is you

10   don't remember any conversation by Mr. Moss during this

11   inspection of the fields?

12   A    No, sir.

13   Q    Am I right?

14   A    That's right.

15   Q    Okay.  And, uh, uh, so, uh--you--were you and Mr. Foresman

16   off by yourselves or with y'all--was Mr. Moss there present?

17   A    When I--Mr. Foresman and I would get out and go in the

18   field, and--and Mr. Moss would come out sometimes.  Sometimes

19   he wouldn't.

20   Q    Okay.

21   A    Sometimes he'd stay at the truck.

22   Q    Tell me about whatever con--did you and Mr. Foresman have

23   a conversation about it out in the field?

24   A    No, we would look--look at the plants, and, uh, when we

25   couldn't find nothing, we--we would move on.

1 Q Okay.  Do you remember any conversation from Mr. Foresman

2 while you were out there doing that?  Anything he said?

3 A No.

4 Q Okay.  All right.  Y'all got through.  What happened then?

5 A Went back to the shop, and we got in my car, and he went

6 in his truck, and we went back to where--Winchester Gin.

7 Q Okay.  What did y'all do at the gin?

8 A We just talked about we couldn't agree what we had found.

9 Q And where--where were you when you were doing that?  Out

10 in the parking lot?

11 A No, we was in the office there.

12 Q Okay.  At the gin?

13 A Yes, sir.

14 Q And, uh, okay.  Uh, bear with me here a second.  I'm

15 having a senior moment.

16 A Me, too.

17 Q I guess you're entitled to claim that.  How old are you,

18 Mr. Gibbons?

19 A Seventy-three.  I'll be seventy-four in July the 22nd.

20 Q Still working a full week?

21 A Yes, sir.

22 Q Uh-huh.  Good for you.  Uh, hope I can do the same when I

23 get to that age.  Uh, do you remember anything specific about

24 the conversation there at the gin?

25 A Mr. Foreman (sic/Foresman) had a county map that he spread

1

1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF ARKANSAS
2            PINE BLUFF DIVISION

3

4   JIMMY MOSS and MOSS FARMS, INC.,   )
                                       )
5              Plaintiff,              )
                                       )
6      vs.                             )Case No. 5:06-cv-010 JHL
                                       )
7   AMERICAN ALTERNATIVE INSURANCE     )
    CORPORATION, et al.,               )
8                                      )
               Defendants,             )
9
                                            COPY
10

11

12

            VIDEOTAPED EVIDENCE DEPOSITION OF
13                  DAVID F. JOHNSON

14

15

16              Videotaped Evidence deposition of
    David F. Johnson taken on May 2, 2006, beginning at 9:00
17  a.m., at 1 Wolfe Creek Lane, Findlay, Illinois, at the
    instance of the Plaintiff, pursuant to Notice and agreement
18  of the parties, before Daphne G. Killam, Certified
    Shorthand Reporter in the State of Illinois.

19

20

21

22

            *   *   *   *   *   *   *   *   *   *   *   *
23

24          ANCHOR COURT REPORTING
               P.O. Box 25471
25         Decatur, Illinois  62525-5471
               217-428-0946

EXHIBIT

tabbies®

# 2

1  And I certainly see no reason why that wouldn't apply to

2  that.  That should be kept confidential.  But I just don't

3  want to waste time on it later on.

4  BY MR. GIBSON:

5      Q.   I saw some stuff where the FBI was contacted.

6  What's that about?

7      A.   We did not contact the FBI.

8      Q.   Do you know anything about that?

9      A.   I told Frosty that with the information that was

10  coming up there, that we needed probably at least get the

11  address from the FBI in case we had to notify them that we

12  thought we were dealing with a conspiracy or a fraud case

13  down there.  And that's it.

14      Q.   Okay.  That was a cautionary instruction then,

15  basically, that you gave Frosty?

16      A.   Yes.

17      Q.   And he got the information -- I mean, according to

18  the documents that I've gotten indicate that Carl Woodham,

19  maybe, was the one that -- that provided that?

20      A.   Yes.

21      Q.   And that has not been pursued, right?

22      A.   Yes.

23      Q.   Because -- because you all haven't found any

24  evidence of conspiracy or fraud, have you?

25      A.   Not that I'm aware of.

1      Q.   What are the reasons?

2      A.   Well, I can give you -- I can give an example --

3      Q.   Please.

4      A.   -- of one that we arbitrated in Northern Illinois,

5  and the umpire lived in Northern Illinois, and being a

6  pilot, I flew up there and picked him up and flew him over

7  to the arbitration site.  And the umpire and the two

8  arbitrators ruled in our favor.

9      Q.   Of AgriServe?

10     A.   Yes.  And the judge overturned the arbitration

11 because I went and picked the umpire up.

12     Q.   In effect, picked up the judge on the case and

13 brought him to the trial?

14     A.   That's exactly right.

15     Q.   And that's what they said about what you did?

16     A.   That's right.

17     Q.   Thought you were unfairly influencing the process?

18     A.   That's exactly right.  Even though we didn't talk

19 about the case, it gave the appearance that we could have.

20     Q.   And so in Illinois, they set it aside and let the

21 man have a jury trial?

22     A.   That's exactly right.  And that's what happened.

23     Q.   All right.  Short of you all making a mistake like

24 that, is there any other basis that you know of for setting

25 aside a binding arbitration deal such as what Mr. Armstrong

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION


JIMMY MOSS and
MOSS FARMS, INC.                                                                  PLAINTIFFS


v.                                          5:06-CV-010 JLH


AMERICAN ALTERNATIVE
INSURANCE CORPORATION                                                             DEFENDANT



ANSWERS TO PLAINTIFFS' SUPPLEMENTAL
INTERROGATORIES PROPOUNDED TO DEFENDANT
AMERICAN ALTERNATIVE INSURANCE CORPORATION

Comes now the defendant, American Alternative Insurance Corporation (hereinafter

"AAIC"), by and through its attorney, The Perkins Law Firm, P. A., and for its Answers to Plaintiffs'

Supplemental Interrogatories Propounded to Defendant American Alternative Insurance Corporation,

states and alleges as follows:

INTERROGATORY NO. 1:  State in dollars the total amount of gross income reported by

the Defendant, American Alternative Insurance Corporation for federal income tax purposes and to

the Securities & Exchange Commission for each of the following years: 2005; 2004; 2003; and 2002.

ANSWER TO INTERROGATORY NO. 1:  Objection.  The information requested by this

interrogatory is not material or relevant to the issues in this cause, is overbroad and is not within the

scope permissible discovery.  Further, plaintiff should be required to make a prima facie showing

-1-

EXHIBIT
# 3

RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:   Objection.

See Answers to Interrogatory Nos. 1, 2 and 3 above.  This interrogatory is vague, overbroad and

unduly burdensome.  Further, said Request seeks documents that are highly confidential, proprietary

and not relevant to the issues presented in the case at bar.

INTERROGATORY NO. 4:   During the deposition of David Johnson on May 2, 2006, he

made reference to an arbitration decision set aside because he flew the umpire to the arbitration in

his private plane.  State the names, addresses and telephone numbers of all persons, including names

of counsel and their addresses and telephone numbers, that were involved in that arbitration, and give

the name, addresses and telephone number of the Court in which said arbitration determination was

set aside as described by Mr. Johnson, and include the case number and case style of the case, and

the name, address and telephone number of the insurance company that had issued the insurance

policy involved and whether they are or have been affiliated with you in any manner, and attach to

your responses hereto true, correct and complete copies of all findings of fact and conclusions of law

made by the Court in setting aside that arbitration determination.

ANSWER TO INTERROGATORY NO. 4:   It is my understanding that to the best of David

Johnson's recollection, the arbitration referred to in his deposition occurred during the 1980's in

Carroll County, Illinois.  Agri-Serve does not have any surviving records on this claim.  Mr. Johnson

does not recall the name of the insurance company involved or the names of the parties.

INTERROGATORY NO. 5:   Have any other arbitration determinations involving Defendant

and its agent Agri-Serve, Inc., been attacked for fraud or other similar wrongful misconduct?  If so,

for all such attacks on arbitration determinations attach copies of all court findings of fact and

conclusions of law respecting same, and for any attacks on arbitration determinations presently in