**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

JIMMY MOSS and                                                                PLAINTIFFS
MOSS FARMS, INC.

v.                                      No. 5:06CV00010 JLH

AMERICAN ALTERNATIVE INSURANCE
CORPORATION                                                               DEFENDANT

**<u>OPINION AND ORDER</u>**

This is an insurance coverage dispute. Jimmy Moss and Moss Farms, Inc., brought claims

for breach of contract, fraudulent misrepresentation, and bad faith against American Alternative

Insurance Corporation ("AAIC") after AAIC's managing general agent, Agriserve, Inc.,[1] denied

claims for hail damage to a cotton crop. AAIC filed a motion for partial summary judgment as to

the issues of fraudulent misrepresentation, bad faith, and punitive damages. For the following

reasons, AAIC's motion is granted in part and denied in part.

**I.**

A court should grant summary judgment when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The party moving for summary judgment bears the initial responsibility of informing the district

court of the basis of its motion and identifying the portions of the pleadings, depositions, answers

---

[1] AAIC by contract has authorized Agriserve to serve as its "managing general agent," but
the record does not show whether Agriserve is a managing general agent as that term is defined
in Ark. Code Ann. § 23-64-402(c)(1).

to interrogatories and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 763 (8th Cir. 2003). When the moving party has carried its burden under Rule 56(c), the non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1985) (quoting FED. R. CIV. P. 56(e)). The non-moving party sustains this burden by showing that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a non-moving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323. In deciding a motion for summary judgment, the court must view the facts and inferences in the light most favorable to the party opposing summary judgment. *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir. 2001) (citing *Rabuska v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997)). If the evidence would allow a reasonable jury to return a verdict for the non-moving party, summary judgment should be denied. *Derickson v. Fidelity Life Assoc.*, 77 F.3d 263, 264 (8th Cir. 1996) (citing *Anderson*, 477 U.S. at 248).

## II.

According to its answer, AAIC issued one policy of crop hail insurance to Moss and two policies of crop hail insurance to Moss Farms, Inc., covering their cotton crops grown in Desha County, Arkansas. The policies provided coverage for loss to the insured cotton crops caused by hail but did not cover loss due to rain, wind, or other weather conditions.

2

On or around September 24, 2005, a storm passed through Desha County.  Moss contacted his insurance agent, Bruce Gasaway, on Monday, September 26, and reported that his crops were damaged by hail during the storm.  On that day a notice of loss for each policy was submitted to Agriserve, notifying it of a claim on the Moss policies.

On October 4, 2005, Mickey Mahon, an adjuster, inspected Moss's fields.  Moss and Mahon have given different accounts of Mahon's inspection that day.  Mahon testified in his deposition that he inspected several plants but did not see any damage due to hail.  Mahon admitted that "there was a lot of cotton on the ground there," but stated that he did not measure the percentage of loss because he did not see that there was a payable loss due to hail.  When Mahon informed Moss of his opinion, Moss became angry and disagreed with him.  Mahon testified that he informed Moss that Moss could have another adjuster look at it and instructed Moss to "save some check-strips" in the fields for future inspection.

Moss testified that Mahon walked about 20 or 25 steps into a field and, as he was walking, stated, "Well, you're not going to want to hear what I've got to say."  When Moss asked, "Well, what is that," Mahon replied, "I see no hail damage."  Moss testified that Mahon made these statements without examining any of the plants.  When Moss disagreed with him, Mahon told Moss that Moss's next option was arbitration and explained the arbitration process.  Moss testified that Mahon's explanation of the arbitration process was that the company would send another adjuster to look at the crop and that Moss would have to get an appraiser to look at it.  If the adjuster and the appraiser did not agree, then the parties would get an umpire whose decision would be final.

After Mahon's visit to Moss's farm, Moss went to Gasaway's office and asked what to do next.  Moss testified that Gasaway prepared three letters for Moss to sign, one for each insurance

policy, stating Moss's contention that the crop damage was caused by hail and requesting "a re-appraisal of the loss." Moss signed them, and Gasaway faxed them to Agriserve on October 6, 2005.

The following day, Agriserve Executive Vice President, Forrest Armstrong, sent two letters to Moss.  One of the letters referenced Moss's claims on his three insurance policies and stated:

> The denial of loss on these claims determined by us was unacceptable by you. Therefore, it is necessary that this claim be arbitrated and that the arbitration process be explained.

Under the General Provisions, Part 6 – APPRAISAL, 2002-NCIS 3 policy it states:

> *"If you and we fail to agree on the percentage the loss caused by one of the insured perils, the following procedure will be used:*
>
> > *a.    One of us will demand in writing that the percentage of loss be set by appraisal.*
> >
> > *b.    Each of us will select a competent appraiser and notify the other of the appraiser's identity within 10 days after the receipt of the written demand.*
> >
> > *c.    The two appraisers will then select a competent, impartial umpire.  If within 10 days of the selection of the appraisers, the two appraisers are unable to agree upon an umpire, you or we can ask a judge of a court of record, in the state which the insured crop is grown, to select an umpire.  If the court fails to act on the request within 30 days, you or we can ask the American Arbitration Association to select an umpire.*
> >
> > *d.    The appraisers will then set the percentage of loss.  The appraisers' written agreement will be final and binding upon you and us.*
> >
> > *e.    If the appraisers fail to agree within 10 days, they will submit their difference to the umpire.  Written agreement signed by any two of these three will set the percentage of loss.  This written report of an agreement will be final and binding upon you and us.*
> >
> > *f.    In the event you or we fail to select an appraiser within the time allowed herein, the appraiser selected by the other party will set the percentage of loss and his written report will be final and binding upon you and us.*

> g.   *The determination of the percentage of loss rendered by these procedures may be entered in any court of competent jurisdiction as a final judgment.*
>
> *Each appraiser will be paid by the party selecting that appraiser.  Other expenses of the appraisal and compensation of the umpire will be paid equally by you and us.*
>
> *We will not be held to have waived any of our rights by any act relating to the appraisal."*

Since we are unable to agree on a percentage of loss, we feel it necessary to invoke the appraisal of the policy.  Please summit [sic] the name, address and telephone number of your appraiser with in [sic] 10 days upon receiving this letter.

(emphasis in original).  The other letter stated:

> Under the General Provisions, Section 6, Appraisal, Agriserve, Inc. and American Alternative Insurance Corporation must submit, by registered mail, the language that will govern the appraisal of loss number 587, Moss Farms Inc.; 589, Moss Farms Inc.; and 590, Jimmy Moss.  The claim was submit [sic] by First Arkansas Insurance, storm date of September 25, 2005.
>
> It is paramount that the evidence in the damaged fields in question should not be tampered with or destroyed in any way, shape, or form.  However, if harvest is imminent the following procedure, if the Company Office is notified at least two days before, can be granted.
>
> A strip the full length of the field and twenty feet wide every ten acres must be left. Fields equal to, or less than, twenty acres need to have a strip the full length of the field, with a strip on each side and one directly in the center.
>
> Violation of the above will constitute destroying evidence and no adjustment will be made.
>
> The APPRAISAL OF LOSS AGREEMENT must be complete on your part and returned to the Company Office.

Believing that he was required to participate in the binding arbitration process described in

Armstrong's letters, Moss completed the "Appraisal of Loss Agreement," naming Mike Foresman

as his appraiser.  Agriserve designated Van Gibbons as AAIC's appraiser.  Sometime in mid-

October, Gibbons and Foresman visited Moss's fields to conduct an appraisal, during which Moss was present.

Gibbons testified in his deposition that he knew that there was a dispute regarding Moss's claim, as Moss and Mahon had disagreed as to the percentage of loss that occurred by hail.  Gibbons stated that he and Foresman looked at the test strips in about 30 fields and that he used a counter or "hand clicker" to do a boll count, but they did not discuss their findings while they were looking at the fields.  The three men then went to the Winchester Gin, where, according to Gibbons, they could not agree on what they had found.

Moss testified that Gibbons did not properly inspect the crops that day because Gibbons neither made "a hundred boll count" nor handled any plants to examine the limbs.  To perform a boll count, Moss testified, "You get down, get down and you separate the plants.  You handle every limb and everything and you count a hundred bolls."  According to Moss, Gibbons clicked the counter a few times, but not enough for a hundred boll count, and remained standing straight up the whole time.

Gibbons and Moss both testified that Moss's workers were picking his crops that day.  Moss further testified that while he, Gibbons, and Foresman were out in the fields his workers called him to ask if they should pick the test strips.  Moss asked Gibbons if he needed to leave the test strips, and Gibbons replied, "As far as I'm concerned, you can pick them."  Moss instructed his workers to pick them and destroy them.

Moss testified that he, Gibbons, and Foresman went to lunch together after the appraisal was completed.  After lunch, they went to the Winchester Gin.  There, according to Moss, Gibbons said, "Well, gentlemen, I don't see any hail damage."  Moss testified that he destroyed no more of his test

6

strips from that point on, but some were already gone.

On October 28, 2005, Moss's attorney sent a letter to Armstrong stating that Moss withdrew his consent to the "Appraisal of Loss Agreement" and would continue with the appraisal process only if it were voluntary and nonbinding. Agriserve responded with a letter from its attorney on November 4, asserting that, "[p]er the policy, any decision rendered by the appraisers and/or umpire is final and binding upon Agri Serve and your client." Moss's attorney replied via fax, "We do not agree that the policy makes the appraisal process described in your letter binding." Five days later, Agriserve's attorney again sent a letter to Moss's attorney stating that "the insurance policy issued to Moss Farms makes the appraisal process mandatory and the decision of the appraisers and/or the umpire as to the percentage of loss binding upon both parties."

On November 17, 2005, Moss submitted a document to AAIC, through Agriserve, entitled "Proof of Loss." This document details the amount of hail damage claimed by Moss in the insured fields under each of his crop insurance policies, amounting to a total loss of $228,804.

On November 23, Agriserve's attorney faxed a letter to Moss's attorney referencing a conversation that the two attorneys had had earlier that day, acknowledging that the appraisal process was nonbinding and voluntary under the terms of the policy. The letter explained that Agriserve's previous position was based upon an interpretation of a copy of the policy that "did not include the Arkansas Amendatory Endorsement page." This page of the policy provides that the appraisal process is voluntary and nonbinding. Thus, the letter stated, Agriserve was willing to go forward with the appraisal on that basis.

Two days later, Moss's attorney responded with a letter asserting that, based upon the attorneys' previous conversation, he understood that Agriserve produced the amendment page of the

policy only when its attorney prompted it to do so.  Moss's attorney further stated that Moss did not wish to proceed with the appraisal process because Agriserve had already informed him of its position that there was no loss due to hail and that Moss wanted AAIC to respond to his "Proof of Loss."

Agriserve mailed a letter to Moss denying his claim on November 29.  The letter concluded by saying that Agriserve would review the matter if Moss had any evidence supporting his claim that his crops were damaged by hail and that he should forward any pertinent information or documents to Agriserve as soon as possible.  April Moss, who is Moss's daughter and works for him on his farm, executed the certified receipt acknowledging receipt of the denial letter on December 3.

Two days later, Agriserve filed a declaratory judgment action, seeking a declaration that Moss was not entitled to coverage for his claims.[2]  Moss then filed this lawsuit against AAIC.

### III.

#### A.      Fraudulent Misrepresentation

AAIC seeks summary judgment on the plaintiffs' claim for fraudulent misrepresentation of the terms of the insurance policy.  Although the complaint states that "AAIC through its general agent Agriserve . . . fraudulently misrepresented material terms of the insurance policy," the plaintiffs state in their response to this motion that "[t]hey deny asserting a claim herein for the common law tort of fraudulent misrepresentation."  Thus, without objection, AAIC's motion for summary judgment is granted as to this issue.

---

[2] Agriserve's declaratory judgment action was dismissed.  *Agriserve, Inc. v. Moss*, No. 5:05CV00337 (E.D. Ark. Jan. 17, 2006).

**B.      Bad Faith**

The Arkansas Supreme Court has stated the law regarding the tort of bad faith as follows:

> An insurance company commits the tort of bad faith when it affirmatively engages in dishonest, malicious, or oppressive conduct in order to avoid a just obligation to its insured. [*State Auto Prop. & Cas. Ins. Co. v.*] *Swaim*, [338 Ark. 49, 56, 991 S.W.2d 555, 559 (1999)].  We have defined "bad faith" as dishonest, malicious, or oppressive conduct carried out with a state of mind characterized by hatred, ill will, or a spirit of revenge.  *Id.*  Mere negligence or bad judgment is insufficient so long as the insurer is acting in good faith.  *Id.*  The tort of bad faith does not arise from a mere denial of a claim; there must be affirmative misconduct.  *Id.*

*Columbia Nat'l Ins. Co. v. Freeman*, 347 Ark. 423, 429, 64 S.W.3d 720, 723 (2002).  Malice, which must be shown to hold an insurer liable for bad faith, may be inferred from conduct and surrounding circumstances.  *First Marine Ins. Co. v. Booth*, 317 Ark. 91, 95, 876 S.W.2d 255, 257 (1994).

The plaintiffs allege that AAIC's bad faith was manifested in several ways.  First, the plaintiffs point to Agriserve's misrepresentation of the terms of the insurance policy to Moss through its repeated statements that the arbitration process was mandatory and binding.  Second, the plaintiffs allege that Agriserve failed to investigate Moss's claim because it had no intention of paying it.  Third, the plaintiffs contend that Agriserve's declaratory judgment action was a tactic intended to oppress Moss.

AAIC admits that Agriserve misrepresented the policy's terms but maintains that the misrepresentation was due to an error, not intentional misconduct.  In support of its position, AAIC has produced Armstrong's deposition testimony that the error was caused when he used a form letter from his computer without realizing its inaccuracy in light of the Arkansas Amendatory Endorsement.  AAIC further maintains that the misrepresentation does not support an inference of bad faith because the arbitration process as described was to be final and binding on both parties.

9

Thus, AAIC argues, the process would have been no more favorable to itself than to the plaintiffs. The plaintiffs, however, point out that AAIC established the appraisal process when it wrote the policy. The plaintiffs have also produced the deposition testimony of Agriserve President David Johnson, conceding that Agriserve would be more sophisticated in this process than a farmer like Moss.

In support of their allegation that Agriserve failed to investigate Moss's claim in a deliberate attempt to avoid payment, the plaintiffs point to the deposition testimony of Moss and two independent crop adjusters, Glover Linnert and Jeff Byrd, who have worked for Agriserve in the past. Moss testified that Mahon told him that there was no hail damage as they walked out onto the field, without examining anything, and that neither Gibbons nor Mahon actually inspected any of the plants. Both Gibbons and Mahon concluded that Moss had no hail damage, although Mahon conceded that "there was a lot of cotton on the ground." Moss further stated that after Gibbons finished his appraisal of Moss's fields, but before he informed Moss that he believed there was no hail damage, Gibbons told Moss to pick the cotton in the test strips that had been saved as evidence. Some of Moss's evidence was thus destroyed.

Linnert and Byrd, who contracted with Agriserve during the summer of 2003, testified that they were hired to appraise crops for hail damage and that they attended a training session on this topic conducted by Agriserve. At this training, Mahon gave a presentation on hail damage. According to Linnert, Mahon concluded his presentation by saying, "[E]verybody knows that you are doing hail insurance, the percentages are usually very low. And when you present it to the farmer, you better have your motor running and be ready to jump in your truck and get gone because the man is not going to be happy." Byrd gave a similar account of Mahon's statements. Linnert

10

further stated:

> And I, as a personal observation, I thought it was very – for something as important as trying to be fair with all parties concerned, this was no way to present a – to a new group of people or people that haven't been involved in adjusting very long.  Just sort of reflected back to me personally as a situation where maybe this company is really reserved in what they're going to pay out as far as indemnities, especially on hail.

Linnert and Byrd testified that on another occasion that summer Mahon showed them a letter written by Johnson to Mahon regarding a hail claim that Mahon had adjusted.  The letter stated that Mahon had adjusted the insured's claim between 12 and 13 percent damage, but that Johnson did not accept this figure and would only pay 3 or 4 percent.  Linnert testified that he believed Mahon was trying to give them the message that hail adjustments should be classified between 3 and 5 percent because Agriserve would not pay more than this amount.  Byrd testified that he understood that Mahon was giving them the message that "Dave Johnson calls the shots.  It doesn't make a difference what kind of counts you take in the field.  He makes the appraisals from his office."

Finally, Linnert and Byrd both testified that at a meeting with Johnson, Mahon, and other Agriserve personnel, Johnson became very angry about the adjusters' determinations as to the percentage of loss on several hail damage claims.  According to Linnert and Byrd, Johnson accused them of colluding with the farmers and made statements to the effect that he had always made money on crop insurance and was not going to lose money on those claims. Linnert testified that he believed Johnson was trying to intimidate him to change his appraisals.  Johnson, who testified that he owns about 45 percent of Agriserve, fired Linnert and Byrd the next day.

The facts relevant to the declaratory judgment action are not in dispute.  Agriserve mailed a letter to Moss denying his claim on November 29, April Moss signed for the letter on December 3, and Agriserve filed suit on December 5.  The parties dispute Agriserve's intent in filing the action,

however, and disagree as to what inferences can be drawn from these facts.  The plaintiffs contend that the declaratory judgment action was a tactic intended to oppress Moss, while AAIC asserts that "[t]he filing of the declaratory judgment simply infers defendant's desire to have its rights adjudicated."

The plaintiffs have produced the deposition testimony of Armstrong, who stated that Agriserve filed suit to "beat [Moss] to the punch."  The plaintiffs argue that many farmers in financial straits due to a loss of revenue might settle for far less than the amount of their lost crops when faced with a lawsuit by their insurer.  While the denial letter stated that Agriserve would consider any additional evidence that Moss might wish to present in support of his claim and instructed him to promptly submit any such evidence, Agriserve gave him less than a week to do so before filing suit.

The credibility of the witnesses and any inferences to be drawn from their testimony and other evidence are issues for the jury to resolve.  *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."). *Cf. Columbia Nat'l Ins. Co.*, 347 Ark. at 428-29, 65 S.W.3d at 723 ("the weight and value to be given the testimony of the witnesses is a matter within the exclusive province of the jury," and the court will defer to the jury's decision unless "there is no reasonable probability to support the version of the successful party").  Viewing the evidence described above in the light most favorable to the plaintiffs and drawing all reasonable inferences in their favor, as the Court must for purposes of this motion for summary judgment, the plaintiffs have produced evidence from which a reasonable jury could find that AAIC acted in bad faith.  More specifically, if the jury credits the testimony of Moss, Linnert, and Byrd as to the training that

Agriserve gave its adjusters with respect to claims for hail damage, the jury could reasonably conclude that Agriserve pressured its adjusters to underestimate the percentage of loss in hail claims to avoid payment.   Moreover, the testimony of Moss describing the investigation by the claims adjusters would suggest that the adjusting process was a sham designed to cover the fact that Agriserve never intended to pay Moss's claim for hail damage regardless of whether the claim was meritorious.  If so, the adjusting process would be something more than a failure to perform; it would be part of a deliberate and dishonest scheme to cheat Moss.  This would be "dishonest . . . conduct . . . to avoid a just obligation to [AAIC's] insured."  *Columbia Nat'l Ins. Co.*, 347 Ark. at 429, 64 S.W.3d at 723.   AAIC's motion for summary judgment as to the plaintiffs' claim for bad faith is therefore denied.

## C.       Punitive Damages

To recover for punitive damages, the plaintiff must prove by clear and convincing evidence that the defendant is liable for compensatory damages and that the defendant acted maliciously and with a "state of mind characterized by hatred, ill will, or a spirit of revenge."  *See* ARK. CODE ANN. §§ 16-55-206 & -207; *Wal-Mart Stores, Inc. v. Binns*, 341 Ark. 157, 164-65, 15 S.W.3d 320, 325 (2000).  "Clear and convincing evidence is that degree of proof which will produce in the factfinder a firm conviction regarding the allegation sought to be established."  *Baker v. Ark. Dep't of Human Servs.*, 340 Ark. 42, 48, 8 S.W.3d 499, 503 (2000).  Proof of the elements of the tort of bad faith supports a claim for punitive damages.  1 HOWARD W. BRILL, ARKANSAS PRACTICE SERIES: LAW OF DAMAGES § 24:4 (5th ed. 2004) (citing *Employers Equitable Life Ins. Co. v. Williams*, 282 Ark. 29, 665 S.W.2d 873 (1984)).   The defendant's motion for summary judgment as to the issue of punitive damages is therefore denied.

13

**D.**     **AAIC's Liability for Agriserve's Acts**

In their response to AAIC's motion for partial summary judgment, the plaintiffs assert that

AAIC is liable for Agriserve's alleged misconduct because Agriserve is AAIC's managing general

agent by contractual agreement.   Plaintiffs raised this issue in their response even though AAIC had

not asserted in its motion for summary judgment that it was not liable for Agriserve's misconduct

and, indeed, had admitted that Agriserve was its managing general agent.[3]   AAIC briefly addressed

this issue in its reply, arguing that Agriserve is an independent contractor and that AAIC therefore

may not be held liable for any tortious acts of Agriserve.

The Arkansas Managing General Agents Act, Ark. Code Ann. §§ 23-64-401 et seq., provides

that "[t]he acts of the managing general agent are considered to be the acts of the insurer on whose

behalf it is acting."   ARK. CODE ANN. § 23-64-406.   The Act defines "managing general agent" as

follows:

> "Managing general agent" means any person, firm, association, limited liability
> company, or corporation who manages all or part of the insurance business of an
> insurer, including the management of a separate division, department, or
> underwriting office, and acts as an agent for the insurer whether known as a
> managing general agent, manager, or other similar term, who, with or without the
> authority, either separately or together with affiliates:
>
> > (A)     Produces, directly or indirectly, and underwrites an amount of gross
> > direct written premium equal to or more than five percent (5%) of the
> > policyholder surplus as reported in the last annual statement of the
> > insurer in any one (1) quarter or year; together with
> >
> > (B)     One (1) or more of the following activities related to the business
> > produced:

---

[3] AAIC has also describes Agriserve as its managing general agent in its pretrial
disclosure sheet, but then states that one of the contested issues is whether Agriserve was an
agent or independent contractor of AAIC.

       (i)       Adjusts or pays claims in excess of an amount determined by
the commissioner; or

      (ii)      Negotiates reinsurance on behalf of the insurer.

*Id.* § 23-64-402(c)(1).

That AAIC cannot be liable for Agriserve's acts, however, was not the basis for AAIC's motion for partial summary judgment. The parties have neither briefed the issue of whether Agriserve was a managing general agent as defined by statute nor provided evidence from which the Court can decide whether there is a genuine issue of material fact on that issue. AAIC, as the moving party, has the burden of presenting a prima facie case of entitlement to summary judgment on this issue. It has not done so on this issue. Therefore, the motion for summary judgment cannot be granted on the basis that AAIC is not responsible for Agriserve's misconduct.

## CONCLUSION

AAIC's motion for partial summary judgment is granted as to the issue of fraudulent misrepresentation and denied as to the issues of bad faith and punitive damages. Document #21.

IT IS SO ORDERED this 1st day of November, 2006.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE